UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- -x

TERRY KEEBAUGH,

                    Plaintiff,

        vs.

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18 Civ.

COMPLAINT

PLAINTIFF DEMANDS
A TRIAL BY JURY

       Plaintiff Terry Keebaugh ("Keebaugh" or "plaintiff"), by her attorneys, Vladeck,

Raskin & Clark, P.C., complains of defendant International Business Machines Corporation

("IBM," the "Company," or "defendant") as follows:

### NATURE OF CLAIMS

       1.     Keebaugh, a 57-year-old woman, worked successfully for IBM for more

than three decades.  On November 30, 2016, IBM fired her claiming falsely that Keebaugh's

position was eliminated as part of a "restructuring."  In fact, in line with its discriminatory

practice, IBM used the restructuring to rid itself of older employees like Keebaugh to open up

positions for millennials, and to avoid paying substantial contractually-owed commissions and

retirement benefits.  Just one month from the date IBM unlawfully fired Keebaugh, she was due

to receive over $570,000 in commissions for 2016.  IBM ultimately paid Keebaugh just three

percent of the commissions she had earned.

       2.     IBM's age discrimination is longstanding and pervasive.  Since 2012, IBM

has implemented age-based "reorganizations" twice a year, sending loyal IBMers over age 50 to

the chopping block, while sparing younger employees.[1]  Indeed, IBM in 2014 kickstarted its "Millennial Task Force" initiative – to which Keebaugh was assigned – aimed at creating a workforce comprised of 75% millennials.  To justify IBM's push for a younger workforce, IBM and its CEO Virginia (Ginni) Rometty ("Rometty") have claimed that the Company needs a "skills transformation" – the very explanation IBM provided for Keebaugh's unlawful dismissal after 30 years of excellent service.

3.     This bogus excuse to fire older workers is part of IBM's playbook.[2]  Keebaugh's colleagues over age 50 who were included in a July 2016 reorganization were told that they were being fired because their "skills were not in-line with IBM's transformation" in the areas of Cloud, Analytics, Mobile, Security and Social, referred to internally by the acronym "CAMSS."  IBM has admitted that "it needs to shed older workers because they[] . . . lack 'contemporary' skills"[3] and has embraced the ageist belief that "CAMS[S] are driven by Millennial traits."[4]

4.     When IBM unlawfully fired Keebaugh she possessed, and indeed succeeded at, each any every skill that IBM has claimed, after-the-fact, she lacked.  While IBM has also attempted to justify Keebaugh's discriminatory firing by asserting falsely that her sales were low compared to her peers, the profits plaintiff generated for IBM in 2016 exceeded by at least twofold the sales of any other Director in Keebaugh's division.  Indeed, Keebaugh's boss in her last performance review covering four of the seven quarters IBM claims were assessed when

---

[1]  See Peter Gosselin and Ariana Tobin, Cutting 'Old Heads' at IBM, ProPublica (March 22, 2018), https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/ (last accessed Nov. 7, 2018).

[2]  A September 17, 2018 Class Action Complaint filed in this District alleges against IBM similar discriminatory practices.  See Edvin Rusis, et al. v. International Business Corp., Case No. 18-cv-8434 DAB.

[3]  Cutting 'Old Heads' at IBM, n.1, supra.

[4]  Cutting 'Old Heads' at IBM, n.1, supra.

the firing decision was made, stated, "Terry [Keebaugh] . . . delivered [t]he best results in the Sector for the year." (emphasis added).

5.     IBM's priorities under its current leadership are clear – to generate quick profits, including to justify substantial bonuses to CEO Rometty and other executives – at the expense of hundreds of loyal, older workers who dedicated decades to IBM.  Rather than recognize and remedy this problem, IBM stands by its discriminatory practices, thereby ignoring a clear need for change in what may forever be remembered only as a morally bankrupt, profit-driven institution.

6.     Keebaugh brings this action to remedy defendant's unlawful discrimination on the basis of her age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA"), and the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. (the "State Law").  Keebaugh further brings this action to remedy IBM's unlawful deduction of her wages in violation of Labor Law § 193(1) (the "Labor Law").

7.     Keebaugh seeks injunctive and declaratory relief, compensatory, liquidated and punitive damages, and all other appropriate equitable and legal relief pursuant to the ADEA, State Law, and the Labor Law.

<u>JURISDICTION AND VENUE</u>

8.     This Court has diversity jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(i) because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

9.     This Court also has general federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because plaintiff has brought a claim pursuant to the ADEA.

10.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction

3

over plaintiff's State and Labor Law claims because these claims closely relate to the ADEA claims, having arisen from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because IBM's Armonk, New York headquarters is located in the Southern District of New York and a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this District.

12.    On August 5, 2017, Keebaugh filed a charge of discrimination against IBM with the United States Equal Opportunity Employment Commission (the "EEOC").  On or about October 8, 2018, plaintiff received the notice of her right to sue from the EEOC. Plaintiff has complied fully with the administrative prerequisites of the ADEA.

PARTIES

13.    Keebaugh is 57 years old and currently resides in the State of Georgia. Keebaugh worked for IBM from 1984 until November 30, 2016 when IBM unlawfully terminated her employment.

14.    IBM is a multinational computer technology and consulting corporation duly organized and existing under the laws of the State of New York, with its headquarters in Armonk, New York.

15.    IBM manufactures and sells computer hardware and software, and offers infrastructure, hosting and consulting services.  It is the largest information technology employer in the world, with over 366,300 employees worldwide.

16.    IBM is an employer within the meaning of the ADEA, the State Law, and the Labor Law.

974679 v1

## FACTUAL ALLEGATIONS

### Background

17.     Keebaugh is a highly-skilled professional with more than 30 years of experience in business development and client relations in the technology industry.

18.     In 1983, Keebaugh graduated from Georgetown University with a Bachelor of Science in Physics.  In 1984, she received a Bachelor of Science in Engineering from Catholic University, graduating *summa cum laude*.

19.     Keebaugh's employment relationship with IBM began in 1984.  Keebaugh worked in IBM's Maryland and Washington D.C. offices for the first ten years of her employment. In the early 1990s, IBM established its southern headquarters in Atlanta, Georgia and Keebaugh relocated to work there in 1994.

20.     During her three-decade tenure with IBM, Keebaugh worked her way up from a marketing representative position to become a Client Director servicing some of IBM's largest clients.

21.     As a Client Director, on average, Keebaugh attended meetings and conferences at IBM's headquarters in Armonk, New York two to three times per year, and regularly reported to executives based in Armonk.  Keebaugh also attended international business trips, including to South America and Asia, several times a year.

22.     When IBM unlawfully fired Keebaugh in November 2016, she held the title Travel and Transportation Client Director.  In that position, Keebaugh managed client services for one key account worth over $100 million, Travelport.  After being assigned the Travelport account in January 2015, in under a year Keebaugh grew client revenues from $65 million to $135 million.  Keebaugh also increased dramatically Travelport's customer

satisfaction, as evidenced by multiple surveys by Travelport staff and executives.

23.     Not only did Keebaugh make a lot of money for IBM, at the time of her dismissal, she was also responsible for driving some of IBM's key initiatives including Cloud, Data, Analytics, Mobile, Security and Social, i.e., "CAMSS."  Working with senior executives at both Travelport and IBM, Keebaugh launched several projects to leverage IBM's capabilities and create new applications for Travelport.  On information and belief, these efforts between IBM and Travelport continued long after Keebaugh's unlawful firing.

<u>Keebaugh Is an Excellent Performer</u>

24.     Throughout Keebaugh's multi-decade career, IBM assigned her new clients in various, sharply different industries without providing Keebaugh any real training on the industries.  With each transfer, Keebaugh was expected to, and did, teach herself and then master the skills necessary to successfully service the accounts IBM assigned her.

25.     Before 2007, for approximately 20 years, Keebaugh serviced IBM's clients in the communications industry, such as Verizon, MCI, BellSouth, AT&T and Cingular.  After Keebaugh was promoted to Client Director, from 2007 through 2014, she worked on IBM's financial services industry accounts, doubling revenues from approximately $250,000,000 to over $500,000,000 per year.

26.     In 2015, Keebaugh was reassigned to Travel and Transportation ("T&T"), specifically to serve as the Client Director for Travelport.

27.     Throughout her lengthy tenure, Keebaugh was an outstanding employee, as evidenced by promotions and increased responsibilities, positive performance reviews, and regular merit-based raises and other incentives and benefits.  Such benefits included consistent Restricted Stock Unit ("RSU" or "share") awards.

974679 v1

28.     For example, from 2007 through 2015, Keebaugh in her annual performance reviews was rated as a PBC[5] 1 (among the top contributors) or PBC 2+ (above average contributor), with the exception of two years for which Keebaugh was rated a PBC 2 (solid contributor), still a high rating.[6]

29.     Indeed, in Keebaugh's 2015 year-end performance review, the last review she received before IBM fired her, defendant rated Keebaugh as a PBC 1 – the highest rating possible.   In that review, Keebaugh's boss, Sherry Lautenbach ("Lautenbach") praised her, stating, "Terry [Keebaugh] . . . delivered [t]he best results in the Sector for the year"; "I look forward to Terry's continued success in 2016"; and "[Keebaugh] is well positioned to be a great leader in our sector."   (emphasis added). Keebaugh was the only executive reporting to Lautenbach who received a PBC-1 rating in 2015.

30.     Keebaugh also received praise and recognition from her former boss, Vice President ("VP"), IBM Financial Services Sector, Robert Hoey ("Hoey").   For example, on January 1, 2016, Hoey stated in an email to Keebaugh:

> You're an impressive person who puts the mission ahead of individual success – this impresses me . . . .  Not many people can accomplish what you did – which is to move off an account – take a lateral assignment – and then grow revenue over 100% [year-to-year] while increasing customer satisfaction.  You are someone who would rather light a single candle then curse the darkness; have the ability to discovery what can be done instead of what can'[t] be done, and; regard client problems as opportunities.

31.     Due largely to retirements and high turnover, for the eight-year period 2008 through 2016, Keebaugh reported to a total of seven different managers.  While Keebaugh in or around 2009 began asking her supervisors what she could do to be promoted to a VP

---

[5]  PBC stands for Personal Business Commitments.

[6]  Pursuant to IBM's "Personal Business Commitments (PBC) – Assessments and Ratings" document, a "solid contributor" rating is defined as: "Consistently achieves goals and meets job expectations; is reliable in doing job.  Demonstrates appropriate level of knowledge, skill, effectiveness, and initiative."

position, a promotion she had clearly earned, her aspirations were never realized mainly because of her ever-changing managers and Keebaugh's multiple reassignments.

32.     In or around summer 2015, Keebaugh expressed to her manager Lautenbach and former boss Hoey her continued interest in a VP position.  In an email dated August 21, 2015, Lautenbach responded, "I want to help you expand your career and be a Vice President . . . <u>We will make this happen</u>." (emphasis added).   On January 1, 2016, Hoey responded, "You are a capable sales executive.  Please let me know and I will continue to advocate on your behalf and will remain supportive of you for bigger jobs."

<u>IBM's Pattern of Discrimination Against Older Workers</u>

33.     During Keebaugh's three decades with IBM, its leadership underwent significant changes, and with these changes in regime came different agendas.

34.     Louis Gerstner ("Gerstner") served as IBM's Chairman and CEO from 1993 until he retired in January 2003.  When Gerstner assumed the position, IBM was experiencing financial problems.  In his ten years as Chairman and CEO, Gerstner was credited for turning the Company around without sacrificing (at least not entirely) IBM's company-shop workplace culture and values.

35.     In early 2003, Sam Palmisano ("Palmisano") replaced Gerstner as CEO.  IBM again faced economic issues when Palmisano became CEO, perhaps as a byproduct of a shaky transition in leadership.  On information and belief, to offset its losses, IBM at Palmisano's direction instituted mass layoffs that targeted older workers, and also implemented less-than-voluntary retirement programs.

36.     The landscape for long-time IBMers has only gotten worse since current Chairman and CEO Rometty replaced Palmisano in 2012.  With Rometty at the helm, since 2012

8

IBM has implemented age-based "reorganizations" twice a year, laying off thousands of high performers over age 50.  On information and belief, IBM generally spares its younger employees in the reorganizations, including by a formal policy which exempts from layoff recent college graduates during their first nine months with IBM.[7]

37.     To make matters worse, Rometty's vision for IBM is a workforce comprised of 75% millennials; to accomplish her goal, Rometty in 2014 created IBM's "Millennial Task Force."  To justify IBM's push for a younger workforce, IBM and Rometty have claimed that the Company needs a "skills transformation."[8]  Keebaugh, then age 55, was fired as part of an alleged "Skills Transformation Plan."

38.     IBM's Millennial Task Force initiative to hire younger workers is confirmed by internal documents exposed in a March 22, 2018 ProPublica article.  For example, IBM in such documents stated as a goal for Cloud products to "shift headcount mix towards greater % of Early Professional hires," i.e., millennials.

39.     The March 22, 2018 article, which investigated age bias at IBM based on "internal company documents, legal filings, [] public records," and interviews and questionnaires by more than 1,000 former IBMers, found that, over the past five years, IBM has eliminated over 20,000 U.S. employees age 40 and over and "[t]argeted people for layoffs and firings with techniques that tilted against older workers, even when the company rated them high performers."

40.     Hypocritically, Rometty has pledged to hire 25,000 people in the United

---

[7] Cutting 'Old Heads' at IBM, n.1, supra.

[8]  The VAR Guy, IBM Touts Trump-Pleasing Hiring Plans, Bloomberg, Jan. 23, 2017, available at http://thevarguy.com/my-world/ibm-touts-trump-pleasing-hiring-plans-while-firing-thousands;  see  Dan Berger, IBM Keeps a Low Profile While Reaction to 'Resource Action' Boils, ITJungle, April 4, 2016, available at https://www.itjungle.com/2016 /04/04/tfh040416-story05/ (last accessed Nov. 7, 2018).

States over the next four years.[9]  In explaining IBM's hiring intentions, Rometty stated, "We are hiring because the nature of the work is evolving."[10]  This statement is ageist, as it implies that older workers cannot evolve with the work.

41.    IBM has accomplished Rometty's ruthless objectives – creating open positions for millennials and cutting costs – by sending loyal IBMers over age 50 to the chopping block with a pittance of severance in its "reorganizations."

42.    On information and belief, despite claiming a reorganization, IBM's forces out older workers to make room for new, younger hires to fill very same or similar positions.

43.    Perhaps in an effort to hide its age-based layoff decisions, and despite its legal obligations to do so, since 2014, IBM does not provide employees affected by layoffs demographic information for other employees included in the layoff.[11]

44.    Prior to 2014, IBM, presumably in order to comply with the Section 626(f) of the ADEA, provided lists to any workers who were laid off, which disclosed the positions and ages of all the employees laid off from their business units at the same time, as well as a list showing the positions and ages of all those in the business units that were not being laid off.  The timing of IBM's change in practice is hardly a coincidence.

45.    In 2016-2017, despite IBM's mass layoffs allegedly imposed due to financial constraints, Rometty paid herself the largest bonus since becoming head of the Company in 2012: $4.95 million.  On information and belief, Rometty's bonus was tied to goals for operating net income, operating cash flow and revenue from the Company's "strategic

---

[9]  Ginni Rometty, We need to fill new-collar jobs that employers demand: IBM's Rometty, USA Today, Dec. 13, 2016, available at http://www.usatoday.com/story/tech/columnist/2016/12/13/we-need-fill-new-collar-jobs-employers-demand-ibms-rometty/95382248/ (last accessed Nov. 7, 2018).

[10]  IBM Touts Trump-Pleasing Hiring Plans, n.8, supra.

[11]  IBM Touts Trump-Pleasing Hiring Plans, n.8, supra.

974679 v1

imperatives."  In 2015, another year plagued by layoffs at IBM, Rometty paid herself a $4.5 million bonus.[12]

46.     To borrow a quote a former IBMer who dedicated nearly forty years to IBM and who, like Keebaugh, was a victim of IBM's discriminatory practices, IBM has become a "toxic wasteland of hypocrisy."[13]

<u>The Patent</u>

47.     In or around fall 2015, Keebaugh was assigned to work on IBM's Millennial Task Force.  The aim of this initiative is to, over a period of approximately four years, transform IBM's workforce to be at least 75% millennials, <u>i.e.</u>, employees in their 20s and 30s. Naturally, as part of this initiative, IBM has and will continue to fire droves of older workers who exceed IBM's discriminatory age limit.

48.     As part of her work on the Millennial Task Force, Keebaugh noticed a problem.  IBM was firing older workers in their fifties and sixties before giving them a chance to train the incoming younger employees that IBM had hired straight out of college to replace them. Naturally, the older workers who were forced to leave were taking with them years, if not decades, of institutional knowledge, including a wealth of information on IBM's mainframes.

49.     Mainframe computers are used primarily by large organizations for critical application and bulk data processing, such as census, industry and consumer statistics, enterprise resource planning, and transaction processing.  Mainframe computers are critical to the functioning of the global economy; mainframe computing is the main technology used by

---

[12]   Anders Melin and Jing Cao, <u>IBM Grants Rometty Record Bonus for 2016 After Shares Recover</u>, Bloomberg, Feb. 6, 2017, <u>available at</u> https://www.bloomberg.com/news/articles/2017-02-06/ibm-grants-rometty-record-bonus-for-2016-after-shares-recover (last accessed Nov. 7, 2018).

[13]  Anonymous, <u>Letter to President Elect Trump and Ginni Rometty, CEO of IBM, from a Former IBMer</u>, ProtectUsWorkers, December 29, 2016, <u>available at</u> http://protectusworkers.org/letter-to-president-elect-trump-and-ginni-rometty-ceo-of-ibm-from-a-former-ibmer/ (last accessed Nov. 7, 2018).

hospitals, financial institutions, airports and insurance companies.  IBM is one of the largest manufacturers of mainframe computers.

50.     Keebaugh realized that many of IBM's Mainframe Clients had not prepared adequately for the pending retirements of their mainframe technicians.

51.     Mainframe malfunctions and outages can be devastating.  When there is an outage, the first priority is to immediately get the system back up and running (within minutes, if possible), and investigate what caused the outage later.  Over the years, Keebaugh and her colleagues gained an understanding of recurring causes for the outages and, correspondingly, solutions for particular types of outages and for outages unique to particular clients.

52.     Not surprisingly, the millennials IBM hired who lacked the benefit of training by their predecessors, did not know how to remedy quickly mainframe malfunctions and outages.  While it could take an experienced (or at least trained) IBMer minutes to remedy an outage, the newcomers needed hours, if not more, to implement a preliminary solution.  IBM's Mainframe Clients started complaining.

53.     As a result, Keebaugh began thinking about how to preempt the mainframe/millennial problem.  She discussed her ideas at an IBM town hall meeting.

54.     During the meeting, Keebaugh recommended that IBM, under her guidance, gather information on best practices and outage solutions from older workers who were leaving, albeit involuntarily, as well from exiting Mainframe Client staff, and upload this wealth of information onto a database.  The database would be used to train new hires, and also serve as an ongoing resource to assist employees to remedy mainframe outages.

55.     IBM was excited about Keebaugh's idea and proposed partnering with

12

Keebaugh to patent her "Cognitive Solution."

56.     After further discussions with colleagues, including members of IBM's elite System Z Distinguished Engineers and Tools Teams ("System Z Teams"),  Keebaugh's idea of imbedding cognitive capabilities into IBM mainframe tools evolved to include the concept of linking key mainframe skills with Human Resources ("HR") and Information Technology ("IT") systems to analyze the impact of skills reductions (vacations, retirements, resource actions, etc.) on the availability of critical IT systems.  For example, when a particular technician retired or was out of the office, IBM and its Mainframe Clients would know which systems may be at risk.

57.     Keebaugh's work on the Cognitive Solution translated to dollars for IBM; Keebaugh secured commitments from the Chief Information Officers of key IBM clients SunTrust and Travelport to participate in a pilot to test the cognitive tools Keebaugh helped create.

58.     When Keebaugh was unlawfully fired, no other T&T Client Director had a patent pending, let alone for a Cognitive Solution – one of the new technologies for which IBM has claimed Keebaugh lacked "skills."  Moreover, no other Director was working with IBM's System Z Teams to imbed cognitive technologies into existing IBM products to bridge the gap between legacy technology and IBM's new millennial workforce.

59.     In the Spring of 2016, Keebaugh and IBM filed a patent application for her Cognitive Solution.  On information and belief, the patent is currently pending.

<u>2016 Reorganizations</u>

60.     In July 2016, IBM completed its third round of firings that year.  This time IBM claimed it was reorganizing all divisions.  As a result, hundreds, if not thousands, of older workers were fired or forced to retire.

974679 v1

61.     Some of Keebaugh's colleagues over age 50 were included in the July 2016 reorganization. These coworkers told Keebaugh that IBM justified their firings by stating, in sum and substance, that their "skills were not in-line with IBM's transformation in the areas of cognitive, analytics, and cloud, etc."

62.     Shortly after the reorganization in July 2016, on information and belief, corporate decision makers had a meeting to discuss the next round of layoffs.  On information and belief, the leaders who attended the meeting went through a list of employees in Keebaugh's group; the decision makers were told only the following about each employee on the list: age, tenure, salary, commissions, and number of RSUs.  Not surprisingly, accomplishments and performance ratings were not included.  Again, IBM disguised the firings as part of a "Skills Transition Program."

63.     During discussions with employees fired as part of the Skills Transition Program, IBM used a script: the employee would be told that his/her skills were not aligned with the Company's direction, namely CAMSS.

<u>IBM Fires Keebaugh</u>

64.     On July 28, 2016, Travelport's Chief Information Officer sent an email connecting Keebaugh to a fellow IBM employee in which he described Keebaugh as "a tremendous asset for IBM and single handedly has been rebuilding the IBM and Travelport corporate relationship."

65.     On August 30, 2016, IBM gave Keebaugh an "Invention Achievement Award" for her Cognitive Solution patent application.

66.     One day later, on September 1, 2016, Keebaugh's boss, T&T VP J. Casey George ("George"), sent her an auto-generated letter stating that she was being fired as part of a

"Skills Transformation Plan."  The letter lists "INSERT DATE" as the date of Keebaugh's termination of employment.  According to the letter, Keebaugh's "departure date" would occur no less than 90 days from the date of the letter, or November 30, 2016.

67.     George is at approximately ten years younger than plaintiff.

68.     George was Keebaugh's seventh manager since 2007.

69.     When George made the decision to terminate Keebaugh's employment, she had reported to him for only two months, and thus his purported assessment of Keebaugh's skills, after 30 years of success at IBM, is specious, at best.[14]

70.     The severance package IBM offered Keebaugh, after she dedicated three decades to the Company, amounted to less than a year's base salary, and required her to waive any and all legal claims against IBM, her right to a jury trial, and her right to join a class action against IBM.

71.     As is its practice, IBM did not provide Keebaugh demographics on the other employees included in the November 2016 reorganization.

72.     After receiving the September 1, 2016 letter, Keebaugh spoke to George by phone.  During the call, George stated, in sum and substance, that IBM "management" had conducted a "comparison of skills" and Keebaugh, the only employee in her sector ranked a PBC 1 in 2015, was rated "lowest of the low" as compared to unidentified others.  George claimed that IBM had to let Keebaugh go because of her lack of skills.  Casey also said, in sum and substance, that "some people who fell in the middle were also being let go.  Can you imagine how *they* feel?"

---

[14] In a 2014 decision affirming the jury's finding of age discrimination, the Court admonished IBM for firing a 61-year-old IBMer who had dedicated four decades to the Company based on an assessment by plaintiff's supervisor involving a similarly short reporting relationship. See Castelluccio v. Int'l Bus. Machines Corp., No. 3:09CV1145 (TPS), 2013 WL 6842895, at *5 (D. Conn. Dec. 23, 2013).

15

73.     On the call, Keebaugh asked Casey to explain the method and/or criteria by which her skills were rated, and who rated her.  Casey refused to provide any further details.

74.     On September 6, 2016, Keebaugh on a call with her manager Lautenbach asked how to appeal IBM's decision to fire her.  During the call, Keebaugh asked about the methodology IBM used to select Keebaugh (and others) for the "reorganization," including the alleged skills metric.  Lautenbach did not provide any details on the methodology or criteria. When Keebaugh asked why she was included in the reorganization, given her solid performance and award for the patent application for a Cognitive Solution (the "C" in CAMSS) just a week earlier, Lautenbach claimed not to know that Keebaugh had received an award for the patent.

75.     Keebaugh also asked that, at the very least, IBM extend her last day by a month to guarantee that IBM paid her the commissions she worked tirelessly to earn throughout 2016.  Lautenbach agreed to help Keebaugh navigate the appeal process, including extending Keebaugh's termination date to ensure that she was paid the substantial 2016 commissions she was owed.

76.     On September 10, 2016, Keebaugh sent an email to Lautenbach listing in detail her contributions to IBM in 2016, and making her case for why IBM should reconsider including Keebaugh in the "Skills Transformation Plan."  In the email, Keebaugh reminded IBM that in just ten months she had doubled revenues for Travelport in 2015 (from $65 million to $135 million), and that she was currently working on approximately $100 million in new opportunities for IBM for the second half of 2016.

77.     In response, Lautenbach stated, "To clarify, I have requested your extension for departure another 30 days.  If you choose to appeal the decision over all you will need to pursue the formal appeals process."  Keebaugh responded to clarify that she sought an

extension to December 31, 2016 "so as to close all contracts expiring on that date" and Lautenbach responded, "Yes that's what I requested.  End of year.  Thanks."

78.     After repeated follow-up emails by Keebaugh to both Lautenbach and her new boss George, Lautenbach responded, "the request went thru the review board and it was rejected unfortunately.  Learned this yesterday."  When Keebaugh asked for an explanation of the basis for IBM's rejection, Lautenbach responded, "They did not give me a reason – which is not really surprising.  They typically do not."

79.     On October 16, 2016, an IBM HR employee notified Keebaugh that her "termination stands."  Keebaugh asked for the criteria that IBM used in making the decision on her appeal; IBM refused to provide any further information.

80.     Prior to the September 1, 2016 firing letter, Keebaugh had never been warned, informed, placed on probation or otherwise admonished for poor sales of substandard skills, which is contrary to IBM's PBC policy applicable to all employees.

81.     To the contrary, throughout her tenure Keebaugh was consistently praised by management and IBM clients.  IBM's deviation from its normal decision-making procedures is evidence of pretext.

82.     As with its handling of Keebaugh's appeal, on information and belief, IBM's investigations of complaints of discrimination are perfunctory and the results predetermined.  Indeed, it has been suggested that IBM's HR department "would be more appropriately named Human Remains."[15]

---

[15]   See, Letter to President Elect Trump, n.13, supra; see also Castelluccio, 2013 WL 6842895, at *3 (precluding admission at trial of IBM HR investigation report in age discrimination and retaliation case because IBM's investigation was not conducted by a neutral party and focused on plaintiff's alleged performance issues rather than his complaints of discrimination; "There is also reason to suspect that the purpose of the investigation was more to exonerate IBM than to determine if [plaintiff] was treated fairly.").  A jury awarded the Castelluccio plaintiff nearly $1.5 million.

974679 v1

83.     Two weeks later, on October 27, 2016, a Travelport executive (VP Air Commerce) submitted a customer survey stating that she was "very satisfied" and that Keebaugh "understands our needs . . . ."   On November 1, 2016, another Travelport executive, VP Applications, described Keebaugh as "a breath of fresh air to the Travelport account."

84.     On November 3, 2016, Keebaugh emailed Stephen Leonard ("Leonard"), General Manager, IBM North America, challenging her firing, and again reminding IBM of her significant contributions in 2016, including her Cognitive Solution patent application and IBM's recognition of same with an Innovation Achievement Award.

85.     Leonard responded on November 7, 2016, stating,

I've had the opportunity to look into your assertions.  In so doing, I understand you have escalated your concerns through the appropriate channels – your upline management and Case Management and Appeals.  Having consulted with both, I do not see anything which leads me to believe that your management team used inappropriate criteria or applied those criteria inappropriately in identifying you for the NA Skills Transformation plan.  I believe you may have been informed by Russ Mandel of the findings and that they are final.

86.     Despite Keebaugh's multiple requests, IBM never explained the "criteria" management used to select Keebaugh and others for the November 2016 reorganization.

87.     On November 29, 2016, Keebaugh received an auto-generated email from HR attaching a Severance Worksheet.  Adding insult to injury, the email was addressed to a different IBM employee based in India.

88.     Also on November 29, 2016, the President and CEO of Travelport emailed Keebaugh to thank her for her work with the company.

89.     In response to Keebaugh's email announcing her "sign[] off" from IBM, clients and coworkers expressed surprise and speculated about the reason for Keebaugh's abrupt departure.  IBM's mishandling of Keebaugh's exit has damaged her professional reputation.

<u>Keebaugh's Replacement</u>

90.    IBM replaced Keebaugh with a younger, less qualified employee, Parke Crawford ("Crawford").

91.    As a Band 10, Crawford was less senior than Keebaugh, a Band D.

92.    Before joining the team, Crawford did not have any experience in Keebaugh's department, the Travel and Transportation Industry group, let alone experience servicing IBM's large accounts.  Keebaugh, by contrast, for decades worked as a Client Director to IBM's biggest clients.

93.    Not surprisingly, Crawford struggled to service the Travelport account at a level commensurate with Keebaugh's.

94.    Keebaugh learned of Crawford's failings from her former teammate, IBM Associate Partner Elizabeth Pollack ("Pollack").  Shortly after Keebaugh's unlawful dismissal on November 29, 2016 and continuing for six months, Pollack called Keebaugh on a weekly basis to complain about Crawford's work on the Travelport account.

95.    Pollack told Keebaugh that she had also complained to Steve Cowley ("Cowley"), IBM General Manager, Cloud, about Crawford's ineptitude.  According to Pollack, George, a decision maker in Keebaugh's firing, warned Pollack to "back off of Parke [Crawford]."  Pollack also told Keebaugh that, despite his warning, Cowley too questioned whether Crawford was qualified to run the Travelport account.

96.    On information and belief, since IBM fired Keebaugh, the Company has generated less revenue from Travelport and customer satisfaction has decreased.

<u>IBM's Shifting Explanations for Keebaugh's Dismissal</u>

97.    Since Keebaugh's unlawful firing on November 29, 2016, IBM has offered

974679 v1

shifting, post-hoc justifications for her dismissal.

98.    As stated above, on August 5, 2017 Keebaugh filed with the EEOC a Charge against IBM alleging age discrimination.  On February 22, 2018, IBM submitted a position statement in response to Keebaugh's Charge ("Position Statement").  The explanation for Keebaugh's firing in IBM's Position Statement differs from the one given to Keebaugh at the time of her dismissal.

99.    Before her unlawful termination, IBM provided Keebaugh one reason why she was being let go – that her "skills" were "lowest of the low" when compared to an unidentified group of colleagues.

100.    In its submissions to the EEOC, however, IBM claims falsely that it fired Keebaugh because she was not selling IBM's "newer technologies" as well as her peers.  In other words, she was fired for poor sales.

101.    The "newer technologies" that IBM after-the-fact claims Keebaugh purportedly failed to sell are the notorious CAMSS (Cloud, Analytics, Mobile, Security and Social).[16]

102.    In a December 2014 presentation, IBM claimed that "to succeed at the new technologies [CAMSS], the company must . . . 'become one with the Millennial mindset.'"[17] In other words, IBM has expressly tied its focus on selling the new technologies to defendant's Millennial Task Force initiative.

103.    Despite IBM's ageist preconceptions, as of June 2015, Keebaugh had secured $39 million in CAMSS sales – more than any other T&T Client Director.  However,

---

[16] See Cutting 'Old Heads' at IBM, n.1, supra.

[17] Despite its stated CAMSS initiatives, IBM is firing in droves older employees working on CAMSS projects.  See id.

right before Keebaugh and her colleagues were due to be paid commissions on the CAMSS sales, IBM reclassified the sales as non-CAMSS.[18]

104.   By reclassifying Keebaugh's 2015 CAMSS sales, IBM accomplished two unlawful objectives: defendant was able to avoid paying over $200,000 in commissions owed to Keebaugh, and it set the stage to fire her for purportedly low CAMSS sales.[19]

105.   IBM in its Position Statement claimed that it fired Keebaugh based on her low CAMSS sales in the seven quarters preceding her firing; the $39 million in reclassified sales were made during four of the seven quarters.

106.   As for the other three quarters, Keebaugh had approximately $100 million of opportunities in her pipeline, including $30 million for CAMSS products due to close on December 31, 2016.  IBM fired Keebaugh a month before she would have been due nearly $600,000 in commissions on those opportunities.

107.   The last performance review Keebaugh received before she was fired,[20] which assigned her the highest possible rating (PBC 1), covered four of the seven quarters referenced in IBM's EEOC submission.

108.   Keebaugh's year-end review written and signed by her then-supervisor Lautenbach, who is more than ten years younger than Keebaugh, expressly acknowledged that Keebaugh had the CAMSS skills IBM now claims she lacked.  Specifically, Lautenbach stated,

Terry . . . delivered the <u>best results</u> in the [Travel and Transportation] Sector for

---

[18] Keebaugh raised her concerns about the CAMSS reclassification in numerous emails in summer 2015 and October 2016, and in her September 2016 internal complaint challenging her unlawful firing.  On information and belief, IBM never investigated or otherwise took any steps to remedy Keebaugh's concerns.

[19] Keebaugh was the only Client Director affected by IBM's reclassification; the two software technicians who worked on the deal were also deprived of their commissions on the CAMSS sales.

[20] The final review date for Keebaugh's 2015 PBC was February 12, 2016, approximately six months before IBM decided to fire her on September 1, 2016.

the year. . . .  She worked on millennial initiatives, <u>social initiatives and analytic based solutions. All focused on our strategic growth areas</u>. She positioned IBM as a strategic partner of Travelport and is working [on] exciting initiatives in 2016 to grow our 'partnership' in <u>an even more innovative manner</u>. I look forward to Terry's continued success in 2016! She is well positioned to be a great leader in our sector. Well done Terry!

109.    During the same seven quarters when Keebaugh's CAMSS abilities were allegedly assessed, Keebaugh received from IBM an "Invention Achievement Award" in recognition of her idea for a Cognitive Solution, the "C" in CAMSS, that resulted in a patent application.

110.    When Keebaugh was unlawfully fired, no other T&T Client Director had a patent pending, let alone for a Cognitive Solution.

111.    Moreover, no other T&T Client Director had the 2015 sales record (CAMSS and non-CAMSS) that Keebaugh had, nor did any other Director have opportunities in his or her 2016 pipeline anywhere near those in Keebaugh's pipeline.

<u>IBM Fires Keebaugh to Avoid Paying Her Commissions Owed</u>

112.    While in 2015 IBM's sales for certain products and services had decreased, sales in Keebaugh's unit, the unit that provides to IBM clients technology services and Cloud platforms, recorded year-over-year growth.

113.    Absent IBM's unlawful termination of her employment, Keebaugh would have produced similarly strong results through the end of 2016, with over $100,000,000 in contracts expected to close by December 31, 2016.

114.    On November 30, 2016 when IBM unlawfully fired Keebaugh, she was working on several, lucrative deals that were due to close a month later.  There was no question that these deals would close at year-end; indeed, on information and belief, they did.  Keebaugh's commissions on these deals were approximately $573,000.  Because IBM fired Keebaugh before

December 31, 2016, she was paid only $20,000.  In other words, IBM cheated Keebaugh out of over $550,000.

116.    This is not the first time that IBM has cheated Keebaugh, and others, out of hard-earned commissions.

116.    In or around June 2015, just before the midpoint of the year (2H),[21] to avoid paying substantial commissions to four employees, including Keebaugh. IBM changed the Incentive Plan it used to calculate commissions, removing a particular product from the eligible products list.

117.    On information and belief, as a result of IBM's unlawful, last-minute change to the Plan, IBM cheated Keebaugh out of approximately $220,000[22] for commissions on revenues that should have counted toward her 2H sales quota.  Keebaugh's manager agreed that the change was unfair; Lautenbach expressly requested that IBM pay Keebaugh the full commission for 2H.  Her request stated, "Terry did everything she could to close as much business in 1H for the IBM Company to help out results.  I would like to ask for your consideration to include Terry to [the Incentive Program] based on her unbelievable contribution to the business last year.  It's the right thing to do.  She is my only executive PBC rating 1.  She deserves it."

118.    IBM nonetheless refused to honor its obligation to pay Keebaugh the full commission.

---

[21] IBM pays commissions based on revenue targets or sales quotas that it sets for the first half of the year (1H), the second half of the year (2H), and the full year (FY).  IBM issues individual sales quotas or plans in January, and again in July.  IBM then measures quarterly whether the employee will meet the respective sales quotas for 1H, 2H, and FY.  An employee is entitled to the full commission percentage only if she meets or exceeds the 1H, 2H and FY quotas.  In other words, even if an employee cumulatively exceeds her FY sales target, she is entitled to her full commission only if she exceeds independently the quotas for 1H and 2H.

[22] The other affected employees were each deprived of over $200,000 in commissions.

119.    On information and belief, the $550,000 owed to Keebaugh was paid to her boss Casey who is approximately ten years younger than Keebaugh, and to her younger, less experienced replacement Crawford.  Casey and Crawford did not do any work on Keebaugh's accounts for which the commissions were based.

120.    Moreover, December 15 is the deadline for IBM to pay out the entire 401(k) employer matching to employees enrolled in IBM's 401(k) plan.  IBM's December 15 deadline means that IBM does not need pay any portion of the Company's annual employer contribution to plan participants that it fires or forces to retire before that date, even though the employees contributed to the plan 11.5 months of the year.

121.    By firing Keebaugh two weeks before the IBM's employer matching deadline, IBM cheated Keebaugh out of benefits worth approximately $15,000.

122.    IBM unlawful termination of Keebaugh's employment also deprived her of the value of future RSU awards that had always been part of her compensation.  The value of Keebaugh's past RSU awards was between $60,000 and $120,000 per year.  When she was fired, Keebaugh also had unvested stock awards worth nearly $130,000.

123.    When Keebaugh discussed her firing with a coworker, the coworker told Keebaugh that she was being fired because she made "too much money."

## FIRST CAUSE OF ACTION

### Age Discrimination Under the ADEA

124.    Plaintiff repeats and realleges paragraphs 1 through 123 as if fully set forth herein.

125.    By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her age, in violation of the ADEA.

126.    Defendant knew that its actions constituted an unlawful violation of the ADEA and/or showed reckless disregard for plaintiff's statutorily protected rights.

127.    As a result of defendant's discriminatory acts, plaintiff suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and damage to her reputation unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

### Age Discrimination Under the State Law

128.    Plaintiff repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

129.    By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her age, in violation of the State Law.

130.    Defendant knew its actions were in violation of the law; these actions were willful and malicious.

131.    As a result of defendant's discriminatory acts, plaintiff suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress,

humiliation, and damage to her reputation unless and until this Court grants relief.

THIRD CAUSE OF ACTION

Wage Reduction Under Labor Law

132.     Plaintiff repeat and realleges paragraphs 1 through 131 as if fully set forth herein.

133.     By the acts and practices described above, defendant failed to pay plaintiff the full amount of her commissions and other compensation, thereby unlawfully reducing her wages in violation of Labor Law § 193(1).

134.     Defendant's failure to pay plaintiff her full wages was "willful" within the meaning of Labor Law § 198(1-a).


WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a.     declaring that the acts and practices complained of herein are in violation of the ADEA, the State Law, and the Labor Law;

b.     enjoining and permanently restraining these violations of the ADEA, the State Law, and the Labor Law;

c.     directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff;

d.     directing defendant to place plaintiff in the position she would have occupied but for defendant's unlawful discriminatory conduct and to make her whole for all earnings and other benefits she would have received but for defendant's unlawful treatment, including, but not limited to, wages, bonuses, commissions, pension, and other lost benefits;

26

      e.      directing defendant to pay plaintiff compensatory damages, including damages for mental anguish, humiliation, damage to reputation and pain and suffering and interest thereon under the State Law;

      f.      directing defendant to pay plaintiff liquidated damages under the ADEA and the Labor Law;

      g.      awarding plaintiff such interest as is allowed by law and damages to compensate for any adverse tax consequences of any award;

      h.      awarding plaintiff the costs of this action together with reasonable attorneys' fees;

      i.      awarding such other and further relief as this Court may deem necessary and proper.

### DEMAND FOR TRIAL BY JURY

      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
        December 21, 2018

                     VLADECK, RASKIN & CLARK, P.C.

                     By: _____
                        Anne C. Vladeck
                        Allison L. Van Kampen
                        Attorneys for Plaintiff
                        565 Fifth Avenue, 9th Floor
                        New York, New York 10017
                        (212) 403-7300

974679 v1