# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

EDVIN RUSIS, HENRY GERRITS, PHIL
MCGONEGAL, and DAVID HO ENG,
*individually and on behalf of all other similarly
situated individuals*,

                             Plaintiffs,

              -against-

INTERNATIONAL BUSINESS
MACHINES CORP.,

                          Defendant.

------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:
:

18-CV-8434 (VEC)

MEMORANDUM
OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: ___3/10/2020___

VALERIE CAPRONI, United States District Judge:

      This is a putative collective action against Plaintiffs' former employer, International

Business Machines Corp. ("IBM"), alleging violations of the Age Discrimination in Employment

Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* Am. Compl. (Dkt. 11) ¶¶ 1, 26–27. Plaintiffs allege

that since the early 2010s IBM has laid off or otherwise forced its older workers out of the

company in a systematic effort to replace them with new hires from the "Millennial" generation.

*Id.* ¶ 15. Plaintiffs seek court-facilitated notice of this action to potential opt-in members of the

ADEA collective. Mot. Issuance of Not. (Dkt. 46). Plaintiffs' proposed notice would be given

to "all individuals who worked for IBM in the United States over forty (40) years of age whose

employment with IBM ended (either because of layoff, discharge, or voluntarily—and thus may

have been constructively discharged) any time since July 14, 2017." Pls.' Mem. of Law (Dkt.

47) at 25. For the reasons stated below, Plaintiffs' motion is DENIED.[1]

---

[1]     This case was originally assigned to Hon. Deborah Batts. Upon Judge Batts's death, the case was
reassigned to the undersigned.

## BACKGROUND

The four named Plaintiffs worked in various jobs and locations at IBM up until their separation in March and June 2018. Plaintiffs most recently held positions as global commodity manager, solution manager for IBM's global system integrator alliances, second line manager of IBM's asset management organization, and senior IT specialist. Am. Compl. ¶¶ 21–24. They reside in cities on both coasts and worked for IBM in California, North Carolina, Georgia, and New Jersey. *Id.* ¶¶ 4–7, 9–11, 23.

IBM is a technology company with a complex business organization: it is divided into multiple groups and sub-units with thousands of teams. Daly Decl. (Dkt. 58) ¶ 5. Today, it has three main business segments addressing different areas of the company's business: Global Business Services, Global Technology Services, and Systems. *Id.* ¶¶ 8–10.

Plaintiffs allege that IBM, in a company-wide effort to replace older employees with younger hires, discriminated against employees in all segments of the company across all job classifications across the entire nation by forcing them to depart because of their advanced age. IBM's policy and practice, according to Plaintiffs, was part of a strategic program to better compete with rivals in the emerging technology sectors of cloud services, big data analytics, mobile security, and social media, internally referred to as "CAMS." Am. Compl. ¶¶ 15–16. *ProPublica* reported that IBM believed that "CAMS are driven by Millennial traits" and "sought to sharply increase hiring of people born after 1980." *Id.* ¶ 16. In an unflattering comparison between "Baby Boomer" employees and employees from younger generations, an internal IBM report from 2006 referred to the former as "gray hairs" and "old heads" and stated that "successor generations . . . are generally much more innovative." *Id.* ¶ 17.

IBM allegedly used several methods to reduce its population of older workers and to

2

phase in younger replacements. *Id.* ¶¶ 17–18. Those methods, according to Plaintiffs, included terminating older employees for pretextual reasons, constructively discharging them, or imposing unreasonable conditions on their continued employment, while shielding younger employees in the company from similar conditions. *Id.* ¶ 19. For example, IBM allegedly required employees to choose between relocating and retirement or required employees to develop new skills and then discharged them without identifying their skill deficit. *See, e.g.*, Pls.' Mem. of Law, Ex. C (Rodgers Aff.) ¶¶ 11–16; *id.*, Ex. D (Rusis Aff.) ¶¶ 9–10. IBM also purportedly wielded blunter methods: it gave inaccurate or perfunctory poor reviews of performance and imposed quotas on mid-level managers to terminate certain numbers of older employees. *See, e.g.*, Rodgers Aff. ¶ 7; Pls.' Mem. of Law, Ex. G (Eng Aff.) ¶¶ 4–7. In addition, IBM consolidated older employees into groups ostensibly created to offer clients specialized support, but that were in fact used to train younger employees before pushing out the older employees. *See, e.g.*, Rusis Aff. ¶¶ 6–7, 10.

## DISCUSSION

### I.  Legal Standards

The ADEA incorporates the Fair Labor Standards Act ("FLSA") enforcement provisions, including the ability of a litigant to maintain an action "for and in behalf of . . . themselves and other employees similarly situated." 29 U.S.C. § 216(b). Pursuant to Section 216(b), a court may authorize notice and order defendants to provide the names and contact information for potential class members to the plaintiffs so the potential class members can be notified of the action and given the opportunity to "opt in." *See* 29 U.S.C. §§ 216(b), 626(b); *see also Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989) ("[C]ourts have discretion, in appropriate [ADEA] cases, to . . . facilitat[e] notice to potential plaintiffs.").

In determining whether to require the defendant to provide names and contact information of all potential opt-in plaintiffs of the collective action, courts in the Second Circuit use a two-step process. *Myers v. Hertz Corp.*, 624 F.3d 537, 554–55 (2d Cir. 2010). At the notice stage, plaintiffs must establish that other employees "may be 'similarly situated'" to them. *Id.* at 555. To meet this burden, a plaintiff need only "make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Id.* (citations omitted).

Although a plaintiff's burden at this stage is modest, "it is not non-existent," *Fraticelli v. MSG Holdings, L.P.*, No. 13-CV-6518, 2014 WL 1807105, at *1 (S.D.N.Y. May 7, 2014) (quoting *Khan v. Airport Mgmt. Servs., LLC*, No. 10-CV-7735, 2011 WL 5597371, at *5 (S.D.N.Y. Nov. 16, 2011)), and generally cannot be satisfied by "unsupported assertions," *Myers*, 624 F.3d at 555. Nonetheless, courts employ a "low standard of proof because the purpose of this first stage is merely to determine *whether* 'similarly situated' plaintiffs do in fact exist." *Id.* (citation omitted). At this first stage, therefore, courts do not examine "whether there has been an actual violation of law." *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 54 (S.D.N.Y. 2005) (citing *Krueger v. N.Y. Tel. Co.*, No. 93-CV-178, 1993 WL 276058, at *2 (S.D.N.Y. July 21, 1993)).

In an ADEA case, at the second stage, when the court has a more developed record, the named plaintiffs must prove that the plaintiffs who have opted in are, in fact, "similarly situated" to the named plaintiffs and were all subject to the same illegal employment practice such that their cases can all be tried together. *See Myers*, 624 F.3d at 555. The action may be "'de-certified' if the record reveals that [the opt-in plaintiffs] are not [similarly situated], and the opt-in plaintiffs' claims may be dismissed without prejudice." *Id.*

4

## II.     Application

Plaintiffs propose a nationwide collective encompassing *all* former employees over the age of forty who left IBM after July 2017.  That definition includes almost 13,000 individuals.[2] Harbol Decl. (Dkt. 67) ¶ 4.  Plaintiffs bear a heavier-than-usual burden (compared to requests to provide notice to a more cabined putative collective) of showing that a discriminatory nationwide policy or plan infected all of IBM's employment separation decisions, regardless of the context or circumstances of separation.  *See, e.g.*, *Vasquez v. Vitamin Shoppe Indus. Inc.*, No. 10-CV-8820, 2011 WL 2693712, at *3 (S.D.N.Y. July 11, 2011) (requiring the plaintiff to show existence of nationwide wage-and-hour policy to meet burden of certifying a nationwide conditional class).

The universe of former employees to which Plaintiffs wish to provide notice might contain within it one or even several groups of former employees who are similarly situated to each other, but Plaintiffs have not met their burden of tying all former employees who are in their proposed collective to a common policy or plan.  No case cited by Plaintiffs provides for notice to as vast a group as sought here.  The cited cases circumscribed the collective in terms of job category, a specific reduction-in-force ("RIF"), or a specific means of discharge (such as constructive discharge).  *See, e.g.*, *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 483 (E.D.N.Y. March 30, 2001) (requiring notice to employees who performed the same function in one facility and were laid off on the same date as part of the same RIF); *Jackson v. N.Y. Tel. Co.*, 163 F.R.D. 429, 430, 432 (S.D.N.Y. 1995) (requiring notice to employees subject to a single "Force Management Plan" reduction in September 1993); *Abrams v. Gen. Elec. Co.*, No. 95-CV-1734,

---

[2]     According to the *ProPublica* article cited in the Amended Complaint, IBM employs approximately 400,000 persons worldwide and has eliminated over 20,000 American employees since 2013.  *See* Am. Compl. ¶ 15 (quoting Peter Gosseling & Ariana Tobin, *Cutting 'Old Heads' at IBM*, ProPublica (March 22, 2018)).

1996 WL 663889, *1–2 (N.D.N.Y. Nov. 4, 1996) (same for employees in single location subject to a single RIF); *Heath v. Google Inc.*, 215 F. Supp. 3d 844, 853 (N.D. Cal. 2016) (same for individuals who interviewed for three specific engineering positions but were not hired).

In a different procedural posture, the Third Circuit articulated salient factors that can tie an ADEA collective together so that it makes sense to try all of the collective members' claims in a single trial: "whether the plaintiffs are employed in the same corporate department, division and location; whether they advanced similar claims of age discrimination; [and whether they] had similar salaries and circumstances of employment." *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 388 n.17 (3d Cir. 2007). Plaintiffs' motion fails along each dimension. Plaintiffs have made no showing, beyond conjecture and the individual affiants' beliefs, that a unifying scheme at IBM links the potential members of the collective to one another despite vast differences in their jobs, locations, and circumstances surrounding their departure from IBM. Without that link, the collective Plaintiffs seek to establish is disparate and heterogenous, incapable of meeting even the lenient evidentiary burden for issuing notice.

In support of their motion, Plaintiffs submitted affidavits from fifteen former employees of IBM. Each affidavit describes a particular incident of alleged age discrimination at a different location, division, seniority level, and job function at IBM. *See* Pls.' Mem. of Law, Exs. C-Q.[3] Although the affidavits do not "name names," it would also appear that the actual decision makers behind the various alleged acts of discrimination are all different. Plaintiffs' proposed collective would pull into a single lawsuit a multitude of distinct decisions to sever the

---

[3] For example, Plaintiffs' motion includes affiants who, at the time they left IBM, worked in Nevada, California, North Carolina, Georgia, New Jersey, Massachusetts, Ohio, Texas, Florida, and Nebraska in job titles of Vice President, Solution Manager, Global Commodity Manager, First-Line Manager, Senior IT Specialist, Software Sales Specialist, Database Architect and Administrator, Client Service Manager, Global Business Services Learning Experience Strategist, Senior Consultant, Analytics Portfolio Sales Representative, Senior IT Specialist/Application Technical Project Manager, Storage Sales Representative, Digital Marketing Manager, and Event Specialist.

employment relationship.[4]  The decisions referenced by Plaintiffs' affiants alone implicate a variety of legal theories, including constructive discharge, adverse employment actions, pretextual "for-cause" terminations, mass layoffs, and retaliation.

That variation, however, does not defeat Plaintiffs' motion by itself; because a common plan or policy could still bind the numerous potential members of Plaintiffs' proposed collective. But Plaintiffs have not made even a minimal showing that such a plan or policy exists.  The affidavits contain no evidence of a common plan or policy behind IBM's separation decisions. Each affidavit relays the former employees' personal experience of being separated from IBM. Some contain statistics that are not helpful because they are not complete.[5]  Some include assertions that contradict Plaintiffs' position,[6] many include conclusory allegations and speculation,[7] and all conclude with a blanket, copy-and-paste assertion: "Based on my

---

[4]    By contrast, "many age collective actions . . . focus on a single common retirement or reduction-in-force decision applicable to all plaintiffs."  Scott A. Moss & Nantiya Ruan, *The Second-Class Class Action: How Courts Thwart Wage Rights by Misapplying Class Action Rules*, 61 Am. U. L. Rev. 523, 577 (2012).

[5]    For example, Edvin Rusis asserts that in 2016, "numerous individuals" over the age of 40 on his team were laid off.  Rusis Aff. ¶ 7.  He is silent on whether numerous individuals under the age of 40 were also laid off and, if so, whether proportionately more employees over the age of 40 were laid off.  Henry Gerrits asserts that between 2017 and 2018, the average age of his department fell from 49 to 44.  Pls.' Mem. of Law, Ex. E (Gerrits Aff.) ¶ 12. Putting aside the fact that the average age remained over 40, that statistic is meaningless—depending on the size of the department, the departure of a single very old employee and the addition of a single very young employee could have moved the average five years.

[6]    Phil McGonegal, for example, describes how another IBM manager "in her early forties" was granted an exception after IBM asked her to relocate, even though IBM would not grant him such a similar exception.  *Id.*, Ex. F (McGonegal Aff.) ¶ 7.  That does not comport with Plaintiffs' request to notice all former employees over forty or their allegation that IBM had an "overarching policy . . . of systematically reducing the number of its older employees in favor of Millennials."  *Id.* at 9.

[7]    Examples include Brian Miller's assertion that his manager said she "believed that IBM's relocation requirement was just a new way that IBM was using to lay off longtime employees," *id.*, Ex. I (Miller Aff.) ¶ 6; Ryan Mount's assertion that "older individuals were only brought in to make the training sessions" for new and experienced employees "look more diverse with respect to age," *id.*, Ex. K (Mount Aff.) ¶ 6; Robert Gasiorowski's assertion that "[i]t is generally understood at IBM that, once an employee has been laid off, IBM will not hire them back," *id.*, Ex. L (Gasiorowski Aff.) ¶ 10; Jennifer Holloway's assertion that IBM management's focus on immediate sales performance rather than overall sales history "was a tactic by IBM to explain away forcing older employees out," *id.*, Ex. O (Holloway Aff.) ¶ 6; and Diane Delaney's assertion that her manager "agreed that [IBM's hiring of younger, inexperienced employees] . . . resembled age discrimination," *id.*, Ex. Q (Delaney Aff.) ¶ 6.

conversations with other current and former IBM employees, I expect that there are many other employees over the age of forty (40) who have lost or will shortly lose their jobs at IBM, who would be interested in joining the case if notified of their right to do so." This Court has found that similarly vague allusions to conversations with co-workers do not support conditional certification. *See Yang v. Asia Mkt. Corp.*, No. 17-CV-6886, 2018 WL 2227607, at \*2 (S.D.N.Y. Apr. 3, 2018).

The Affidavit of Catherine Rodgers—Vice President in the Global Engagement Office and Senior State Executive for Nevada—comes close to articulating a factual basis for a collective, but not the broad, all-encompassing collective Plaintiffs propose. Her affidavit might support notice to a collective comprised of former employees of the group she oversaw; she asserts personal knowledge that every employee laid off in her group was over fifty and that her group experienced a higher layoff percentage than groups comprised of younger employees. *See* Rodgers Aff. ¶¶ 6–9. But that is not the collective that Plaintiffs are proposing. Ms. Rodgers's group is a tiny fraction of IBM's business; her affidavit simply does not support nationwide certification.

The remainder of Plaintiffs' evidence, which is the *ProPublica* article and two documents referenced in the article, also does not adequately link the vast group Plaintiffs seek to notify.

The Court declines to rely on the opinions expressed in the *ProPublica* article. *See* Am. Compl. ¶¶ 15–16; Peter Gosseling & Ariana Tobin, *Cutting 'Old Heads' at IBM*, ProPublica (March 22, 2018). Its critique of IBM's employment practices is not based upon the personal observations of affiants sworn under penalty of perjury or on documentary evidence submitted to the Court, but rather is based on a subjective synthesis of various statistics, IBM documents, and employee statements by individuals whose journalistic credentials are unknown to the Court.

8

*See* Pls.' Mem. of Law at 3–6.  Plaintiffs highlight an assertion in the article that there was an effort to "correct [the] seniority mix" at IBM.  *Id.* at 3.  That assertion was based on an undated internal presentation, but Plaintiffs do not show that there was anything nefarious in that effort. It is just as plausible that "correct[ing the] seniority mix" meant balancing inexperienced with experienced employees to maintain a range of seniority in the talent pool for purposes of rational succession planning.  *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 608–09 (1993) ("The Courts of Appeals repeatedly have faced the question whether an employer violates the ADEA by acting on the basis of a factor, such as an employee's pension status or seniority, that is empirically correlated with age. . . . We now clarify that there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age.").

Plaintiffs also extract two documents referenced in the *ProPublica* article.  *See* Pls.' Mem. of Law at 6.  Neither supports the existence of a nationwide policy or plan to discriminate against older employees.  The first, an internal IBM document that used the terms "gray hairs" and "old heads," predates Plaintiffs' notice period by more than a decade—it was written at a time when some current Plaintiffs and proposed members of the collective were just beginning their careers at IBM—and it predates the onset of IBM's alleged discriminatory strategy by six years.  *Id.*  The second, a document presented at a conference in 2014 titled "Reinvention in the Age of the Millennial," contains no evidence of discrimination in its pronouncements that IBM should "embrace the 'Millennial mindset.'"  *Id.*

Plaintiffs lastly rely upon decades-old decisions that apparently imposed a lower burden of proof than is required today.  In *Heagney*, for example, the court granted a conditional certification motion based upon allegations in the complaint that a bank was strategically

9

replacing an older workforce with a younger one.  *Heagney v. European Am. Bank*, 122 F.R.D.

125, 127–28 (E.D.N.Y. 1988); *see also Frank v. Capital Cities Commc'ns, Inc.*, No. 80-CV-

2188, 1983 WL 643, at *2 (S.D.N.Y. Oct. 11, 1983).  Plaintiffs' reliance upon *Heagney* ignores

later developments in the law that Plaintiffs' burden, albeit modest, "cannot be satisfied simply

by unsupported assertions."  *Myers,* 624 F.3d at 555 (quotation omitted).  A plaintiff must

provide "actual evidence of a factual nexus between his situation and [the persons] he claims are

similarly situated rather than mere conclusory allegations."  *Prizmic v. Armour, Inc.*, No. 05-CV-

2503, 2006 WL 1662614, at *2 (E.D.N.Y. June 12, 2006).  Given the absence of material

similarities across potential plaintiffs in this case, a collective action of the scale Plaintiffs

propose would not lend itself to "efficient adjudication of similar claims."  *Lynch v. United*

*Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 367 (S.D.N.Y. 2007) (quoting *Hoffmann–La Roche*, 493

U.S. at 170); *see also Campbell v. City of Los Angeles*, 903 F.3d 1090, 1114 (9th Cir. 2018)

(collective actions require "similarity of the kind that 'allows plaintiffs the advantage of lower

individual costs to vindicate rights by the pooling of resources.'  That goal is only achieved—

and, therefore, a collective can only be maintained—to the extent party plaintiffs are alike in

ways that matter to the disposition" of their claims (quoting *Hoffmann–La Roche*, 493 U.S. at

170)).

       The Court therefore declines to give Plaintiffs' proposed notification its imprimatur.

That should not dissuade aggrieved former employees of IBM from pursuing their rights under

the ADEA, whether by opting into this lawsuit or filing suit independently.  Plaintiffs are,

however, not entitled to court-assisted notice on the scale requested.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for issuance of notice is DENIED. The Parties are ordered to appear for a conference on **April 10, 2020, at 10:00 a.m.**, and must confer and submit a joint letter and proposed Case Management Plan and Scheduling Order no later than **April 2, 2020**, in accordance with the undersigned's Individual Rules.

The Clerk of Court is instructed to close docket entry 46.

**SO ORDERED.**

Date:  **March 10, 2020**
         **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**